**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

U.S. MORTGAGE, INC., a Nevada
corporation; JOHN KEILLY, an
individual; JOHN W. BROUWERS,
MEMORANDUM DISPOSITION,
BROUWERS FAMILY LIMITED
PARTNERSHIP, FIRST SAVINGS BANK;
COMMUNITY COLLEGE OF SOUTHERN
NEVADA FOUNDATION; CONNELLY
FAMILY TRUST, Terry Connelly and
Mary Connelly, Trustees; ALISA
CROMER; DOVE, LLC; GERALD AND
LUCETTE DOWLINGS TRUST DTD
07/06/99, Gerald and Lucette
Dowling, Trustees; DR.
INVESTMENTS, LTD.; LORRAINE A.
ENGLE, Trustee of the Lorraine A.
Engle Family Trust UAD
05/31/79; GUY GAGNON, Trustee of
the Gagnon Family Trust; DIANA
JOAN GAGNON, Trustee of the
Gagnon Family Trust; ARLENE M.
GARMAN LIVING TRUST DTD
02/13/01, Arlene Garman, Trustee;
GUNNING FAMILY TRUST UAD
12/09/94, Sean and Emily
Gunning, Trustees; BARBARA K.
HANFORD LIVING TRUST UAD
05/03/96; MICHAEL HARLAN; CARL
JENSEN, Trustee of the Jensen
Family Trust UAD 10/27/90;

No. 04-17494

D.C. No.
CV-03-01615-SMM

OPINION

JANET JENSEN, Trustee of the
Jensen Family Trust UAD
10/27/90; JOHN M. KEILLY, Trustee
of the Keilly Family Trust; JO M.
KEILLY, Trustee of the Keilly
Family Trust; WILLIAM KREGER
IRA ROLLOVER ACCOUNT,
CUSTODIAN OF THE FIRST SAVINGS
BANK, agent First Savings Bank;
MARVIN L. REHKOP FAMILY TRUST;
EUGENE H. REISE; LEONARD
RODOWICK, Trustee for the
Rodowick Family Trust; ALICE
RODOWICK, Trustee for the
Rodowick Family Trust; SCHEER
FAMILY TRUST, Ronald W. Scheer
and Lori Scheer, Trustees; SCHLAF
FAMILY TRUST, Pauline M. Schlaf
Trustee; ROBERT SEGA; ALLIS SEGA;
VELATIA SPEZIALE, Trustee of the
1994 Speziale Living Trust; DALE
STERNER; WINSTROM PROPERTIES,
INC.; EILEEN WRIGHT; NEVADA
INVESTORS, INC.; STANLEY AMES
TRUST DTD 09/09/86, Stanley
Ames, Trustee; EDWARD U. AUSTIN
REVOCABLE TRUST; EDWARD U. AND
MARJORIE B. AUSTIN UNITRUST
UAD 12/01/95, Robert Austin,
Trustee; MARCEL BAREL TRUST;

ROBERT J. BELL, Trustee of the
Robert J. Bell and Virginia M.
Bell Trust; VIRGINIA M. BELL,
Trustee of the Robert J. Bell and
Virginia M. Bell Trust; VERIE
BLOOM; MICHAEL B. CHAPMAN,
JTWROS; MARGARET B. CHAPMAN,
JTWROS; ECONOMIC STUDIES, INC.;
PHILIP ENGLE FAMILY PARTNERSHIP,
Philip Engel, Trustee, as General
Partner; PHILIP ENGEL AND ADELE
ENGEL FAMILY TRUST, Philip Engel,
Trustee; WALLEEN Y. EVESLAGE;
LARRY W. FIORENZI; KARL S.
GANZ; KOLAD 5, a Nevada Limited
Liability Company, et al.,
                    *Plaintiffs-Appellants,*

v.

JAMES C. SAXTON; JANE DOE
SAXTON; DOUGLAS HENSLEY,
husband; JANE DOE HENSLEY, wife;
MARC S. HECHTER, husband; JANE
DOE HECHTER, wife; TIMOTHY J.
ADAMS, husband; JANE DOE
ADAMS, wife; MICHELE SAXTON-
PORI, wife; JOHN DOE SAXTON-PORI,
husband; KATRYN WONDERS, wife;
JOHN DOE WONDERS, husband;
KIRK SCHERER, husband; JANE DOE
SCHERER, wife; MELODY J.
SULLIVAN; JOHN DOE SULLIVAN,
husband; DELOITTE AND TOUCHE, a
limited liability partnership,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, District Judge, Presiding

Argued and Submitted
April 19, 2007—San Francisco, California

Filed July 13, 2007

Before: Stephen Reinhardt, Jay S. Bybee, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

**COUNSEL**

George C. Lazar, Fox Johns Lazar Pekin & Wexler, APC, San Diego, California, for the plaintiffs-appellants.

David M. Furbush, O'Melveny & Myers LLP, Menlo Park, California, for the defendants-appellees.

**OPINION**

MILAN D. SMITH, JR., Circuit Judge:

Plaintiffs-appellants U.S. Mortgage, et al., appeal the dismissal of their lawsuit against defendants-appellees Saxton, Inc. (Saxton), Deloitte and Touche LLP, et.al., alleging, among other things, violations of Arizona law by incorporation of false financial information into Saxton's regulatory filings on which plaintiffs relied in making several loans and granting several loan-related concessions to Saxton and its affiliates. Defendants removed the lawsuit to federal court under the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb (SLUSA), and the district court dismissed the lawsuit for failure to state a claim upon which

relief can be granted in conformity with SLUSA. We affirm the removal and the dismissal of the lawsuit.

## *FACTUAL BACKGROUND*

Defendant Saxton[1] is a real estate development company incorporated and domiciled in Nevada. At all times relevant to this appeal until June 14, 2000, Saxton's stock was listed and publicly traded on the NASDAQ exchange[2] and Saxton was engaged in several real estate development projects that it financed, in part, with loans from individuals, trusts, and commercial investors. The plaintiff class consists of hundreds of investors. Plaintiffs' claims arise out of twelve separate loan investments that Saxton solicited from various members of the plaintiff class to finance several of its projects and activities. The twelve loan transactions alleged in plaintiffs' second amended complaint (SAC) are as follows:

## 1. Pelican Creek Loan:

In December 1996, 29 members of the plaintiff class made a combined loan of $1,500,000 to Savannah, LLC, a Nevada limited liability company, to finance the construction of living units in a residential area of Clark County, Nevada. The loan was evidenced by a promissory note secured by the lien of a deed of trust on the property. In 1999, Pelican Creek Development, Inc., whose president was defendant James Saxton, acquired Savannah's interest in the relevant property. At Pelican Creek's request, the plaintiff lenders consented to Pelican Creek's assumption of Savannah's obligations under the note and waived enforcement of the due on sale clause in the deed

---

[1]Defendants in this case include both Saxton, Inc., a Nevada corporation, and James Saxton, the Chairman of the Board of Directors, President, and Chief Executive Officer of Saxton, Inc. All references to "Saxton" in this opinion are to Saxton, Inc., and not to James Saxton.

[2]Saxton stock was officially delisted from the NASDAQ exchange on June 14, 2000.

of trust securing the note, in exchange for which Saxton extended a repayment guarantee to the plaintiff lenders. The relevant plaintiff lenders allege that they would not have consented to Pelican Creek's assumption of the loan had they known Saxton's true financial condition.

## 2. Taylor Ranch Loan:

In January 1997, Saxton entered into an agreement with Howard Hughes Properties, L.P., to acquire property in the City of North Las Vegas. Saxton intended to develop the property into residential units, but was required to obtain certain entitlements before being permitted to do so. Thereafter, Saxton solicited and received a loan of $5,300,000 from a large number of the plaintiff lenders. The loan was evidenced by a note and was secured by the lien of a deed of trust on the property. Saxton was unable to obtain the necessary rezoning and was, therefore, unable to develop the property. Saxton requested and received two extensions of maturity on the note, but ultimately defaulted on the loan in March of 2000. Collateral for the loan was eventually liquidated, leaving an unpaid principal balance due of $941,205.12. The plaintiff lenders allege that they relied on Saxton's misrepresentations of financial strength in its public filings, and would not have granted the extensions had they known Saxton's true financial condition.

## 3. The Saxton $1,220,000 Loan:

In October 1997, Saxton sought a $1,220,000 working capital loan from a number of plaintiff lenders. The loan was evidenced by a note and was secured by a pledge of 491,754 shares of Saxton stock owned by defendant James Saxton. In alleged reliance on misrepresentations concerning Saxton's financial strength as reflected in its public filings, plaintiffs agreed to two extensions of the loan. Saxton defaulted on the loan in March of 2000.

### 4.  The Corte Madera Loan:

In late 1997, 23 plaintiff lenders loaned Corte Madera, LLC the sum of $2,000,000 to permit it to acquire 15.8 acres of real property in the City of Las Vegas. Corte Madera intended to develop the property into a 192-unit town home project. The loan was represented by a note and secured by the lien of a deed of trust on the property and was guaranteed by Saxton. Saxton subsequently entered into an agreement with Corte Madera whereby Saxton agreed to construct the town homes and to serve as Corte Madera's manager. Plaintiffs agreed to two extensions of the note's maturity date, again in alleged reliance on misrepresentations in Saxton's public filings. The note went into default in March of 2000.

### 5.  The Sutter Creek Loan:

In December 1997, numerous plaintiff lenders loaned funds to Saxton to enable it to acquire the interest of Sutter Creek, LLC in a subdivision project in Clark County, Nevada. The loan was evidenced by a note secured by the lien of a deed of trust on the acquired property. The remaining principal balance due on the loan is $877,347. Plaintiffs allege that they were induced by misrepresentations in Saxton's public filings to agree to extensions of the note and to refrain from exercising available rights under the deed of trust. Saxton defaulted on this loan in March of 2000.

### 6.  The United Mortgage Loan:

In June 1998, certain plaintiff lenders loaned funds to U.S. Mortgage Corporation to permit it to acquire and develop certain real property in Clark County, Nevada. The loan is evidenced by a note and secured by the lien of a deed of trust on the property. The outstanding principal balance of the loan is $7,957,591. Saxton agreed to manage the construction of warehouses on the acquired property and also executed a repayment guarantee and an environmental and accessability

indemnity agreement for the benefit of the plaintiff lenders. Plaintiff lenders allege that Saxton used the proceeds of the loan to pay off an existing line of credit with one of its institutional lenders and not for the purposes represented. These plaintiffs also allege that defendants made misrepresentations and permitted omissions in Saxton's public filings and that they relied on these misrepresentations and omissions both in making the loans and in failing to exercise remedies included in the loan agreements.

**7.   The Sterling Springs Loan**:

In September 1998, certain plaintiff investors made an $8,590,000 loan to Saxton to enable it to fund certain construction costs in its Sterling Spring project in Clark County, Nevada and to secure release of the project from the liens of several institutional lenders. The loan was evidenced by a note and secured by the lien of a deed of trust on the project. Saxton defaulted on the loan in March of 2000. The remaining principal balance of the loan is $6,558,775. Plaintiffs allege unspecified harm from reliance on misrepresentations in Saxton's public filings.

**8.   The Diamond Key Acquisition Loan:**

In November 1998, Saxton sought a $1,000,000 short-term loan from 15 plaintiff lenders to fund its acquisition of Diamond Key Homes, Inc., a Phoenix-based construction company. The loan was evidenced by a note and was secured by a pledge of certain Saxton stock held by defendants James and Dorothy Saxton. In 1999, certain of the plaintiff lenders agreed to an extension of the maturity date of the loan while other lenders were paid in full. Saxton defaulted on the note in March of 2000. Plaintiffs allege unspecified harm from reliance on misrepresentations in Saxton's public filings.

**9.   The Diamond Key Loan:**

In March 1999, 21 plaintiff lenders made a $1,000,000 loan to Saxton affiliate Diamond Key Homes to enable it to

develop certain Arizona real property. The loan was evidenced by a note and secured by the lien of a deed of trust on the lots to be developed. Diamond Key Homes defaulted on the loan and the involved plaintiff lenders allege unspecified harm from reliance on misrepresentations in Saxton's public filings.

**10.   The Levitz Plaza Loan:**

In September 1999, Saxton approached Investors Mortgage Corporation, a Nevada mortgage broker, seeking a loan to consolidate certain existing loans and to provide working capital. Certain plaintiff lenders made a $5,655,000 loan to Saxton and its affiliates, Levitz Plaza, LLC, and Diamond Key Homes. The loan was evidenced by a note and was secured by the liens of deeds of trust on a number of properties in Nevada and Arizona. This loan also went into default in March of 2000 and has an outstanding principal balance of $5,336,200. Plaintiff lenders allege unspecified harm from reliance on misrepresentations in Saxton's public filings.

**11.   The Saxton $1,025,000 Loan:**

In December 1999, Saxton executed a note for $1,025,000 to 33 plaintiff lenders, which note was secured by the pledge of 691,050 shares of Saxton stock. Saxton defaulted on the loan in March of 2000. Plaintiff lenders claim unspecified harm from reliance on misrepresentations in Saxton's public filings.

**12.   Arizona Project:**

In February 2000, a group of plaintiff lenders loaned $1,400,000 to Diamond Key Homes alone and $2,600,000 to Diamond Key Homes and Saxton. The $1,400,000 loan was secured by the lien of a deed on trust on property in Maricopa County, Arizona and the proceeds of the loan were to be used to develop the property securing the loan. The $2,600,000

loan was secured by the assignment of an interest in a purchase contract for land near Tucson, Arizona. The loan proceeds were to be used to develop the property being acquired. The borrowers on both these loans defaulted in March of 2000. Plaintiff lenders claim unspecified harm from reliance on misrepresentations in Saxton's public filings.

## PRIOR PROCEEDINGS

In 2000, Saxton voluntarily restated its financial results to correct a miscalculation of certain interest expenses. The incorrect interest calculation had caused Saxton to overstate its earnings in several public filings and accompanying press releases in 1998 and 1999. Certain of the individual defendants were signatories of the regulatory filings, and defendant Deloitte & Touche was responsible for auditing and approving those filings. The restatement resulted in an increase of approximately 4.7% in Saxton's total expenses for the first three quarters of 1999.

Following the restatement, certain plaintiffs—not parties to this suit—brought a securities class action in Nevada federal district court against Saxton, several of its directors and officers, and Deloitte & Touche. The complaint alleged that defendants issued false financial statements in order to inflate the price of Saxton stock, and that class members relied upon the misrepresentations to purchase the stock at that inflated price. The Nevada complaint further alleged that Saxton used its artificially-inflated shares as payment for its acquisition of several entities, including Diamond Key Homes and Homebank Mortgage Corporation.

The Nevada district court dismissed the complaint for failure to comply with the substantive and procedural requirements of the Private Securities Litigation Reform Act of 1995,

15 U.S.C. § 78u-4 (PSLRA). The dismissal of the Nevada lawsuit was the subject of a separate appeal to this court.[3]

Following dismissal of the federal claim, present plaintiffs filed a substantially similar complaint in Arizona state court and a first amended complaint (FAC) in the same court several months later. Both the Nevada and Arizona complaints pled the same essential misconduct, but the Arizona complaint claimed violations of Arizona state law rather than federal law.[4] While the Nevada complaint only presented allegations concerning the purchase of Saxton stock, the FAC pled that the plaintiffs had loaned Saxton money as investment interests and listed several specific projects to which these loans related. The FAC includes an extensive list of individual investors who extended loans to Saxton in support of various real estate projects.[5] The essential theory of liability in the FAC is that the loans would not have been made, renewed, or continued if plaintiffs had known Saxton's true financial condition or had plaintiffs not relied on Saxton's erroneous financial statements.

The defendants removed the action to the Arizona district court under SLUSA. Plaintiffs filed a motion to remand, claiming that SLUSA did not apply to their lawsuit, and submitting a declaration purporting to add additional facts to supplement the complaint. The district court denied plaintiffs' remand motion, holding that SLUSA barred the complaint. While the district court noted that SLUSA authorizes outright dismissal of a SLUSA barred lawsuit, it nevertheless gave plaintiffs an opportunity to file a second amended complaint

---

[3]*In re Saxton, Inc. Securities Litigation*, No. 02-16172. The decision in that appeal is noted in an unpublished memorandum disposition.

[4]Present plaintiffs have acknowledged this by arguing in their motion to remand that they, "having been shut out of federal court, are simply endeavoring to prosecute state law claims that are not preempted by SLUSA."

[5]Most plaintiffs lent between $10,000 and $50,000.

in an attempt to meet the requirements of SLUSA while avoiding the impediments of the PSLRA.

Plaintiffs filed a 207-page SAC that differed substantially from the FAC in form, but not in substance. Whereas the FAC gave one comprehensive list of all plaintiff lenders and one comprehensive set of factual allegations, the SAC divides the plaintiff lenders into twelve overlapping sets and alleges individualized facts regarding the twelve loan transactions. As alleged in the SAC, some factual differences exist among the different loan transactions; however, the underlying allegations of Saxton's misconduct remain virtually unchanged. As was done in the FAC, the SAC claims that Saxton, through its officers and employees, made material misrepresentations concerning the financial status of the company in its SEC filings and other public statements; that Deloitte & Touche failed to comply with the applicable accounting standards in approving those misrepresentations; and that the plaintiff lenders reasonably relied on the misrepresentations and, as a result, suffered damages.

The essential theories of legal liability also remained unchanged in the SAC. The FAC alleges five theories of liability: negligence, negligent misrepresentation, and fraud against all defendants; breach of fiduciary duty against the individual defendants; and aiding and abetting breach of duty against Deloitte & Touche. The SAC alleges these same five theories of liability against these same defendants, but it subdivides them based on the particular transaction involved and also adds additional theories regarding several of the transactions. The SAC also clarifies that SEC rules and regulations[6] are the sources of defendants' duties and that those duties

---

[6]The allegations of negligence and negligent misrepresentation specifically identify SEC rules and regulations as the source of the duty. The allegations of breach of fiduciary duty, however, identify no specific source of that fiduciary duty. Presumably plaintiffs refer to an unspecified provision of Arizona state or common law.

were allegedly breached by misrepresentations in public filings and other public statements.

The district court dismissed the SAC with prejudice. Plaintiffs appeal the dismissal to this court.

## STANDARD OF REVIEW AND JURISDICTION

We review the grant of a motion to dismiss and the denial of a motion to remand de novo. *Patenaude v. Equitable Life Assurance Soc'y of U.S.*, 290 F.3d 1020, 1023 (9th Cir. 2002). We review the denial of leave to amend for abuse of discretion. *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002). "Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Id.* (citing *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991)).

The district court had jurisdiction over the removed action under SLUSA, 15 U.S.C. § 78bb(f)(1). We have appellate jurisdiction over the dismissal under 28 U.S.C. § 1291.

## DISCUSSION

### I.  Statutory Background.

The historical background of Congress' enactment of the PSLRA and its subsequent enactment of SLUSA is well-known and well-documented elsewhere. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 126 S.Ct. 1503, 1510-12 (2006); *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1128 (9th Cir. 2002); *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 332 F.3d 116, 122-24 (2d Cir. 2003). Nevertheless, we briefly summarize key points of this history that are relevant to the resolution of this case. In 1995, Congress passed the PSLRA because it was distressed with the proliferation and cost of allegedly meritless federal securities class actions. The PSLRA sought to curb abusive and frivolous

securities suits by imposing new procedural and substantive requirements. Among other things, the PSLRA (1) required plaintiffs to identify in their pleadings actual statements alleged to have been misleading and particular facts supporting a "strong inference" that the defendants acted with the required scienter, (2) imposed an automatic stay of discovery during the pendency of any motion to dismiss, and (3) established safe-harbors for certain forward-looking statements. *Dabit*, 126 S.Ct. at 1510-11; *see also Patenaude*, 290 F.3d at 1025; *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999).

**[1]** Although the PSLRA was effective in reducing allegedly frivolous federal securities claims, this was largely because class action attorneys avoided its reach by filing their securities class actions in state court under state and common law. Congress recognized this unexpected development in a joint House-Senate Committee report, noting that the decline in federal securities class actions following the enactment of the PSLRA was accompanied by a corresponding increase in state class actions. *See* H.R. Conf. Rep. No. 105-803 (1998). Congress enacted SLUSA to foreclose this alternative. *Patenaude*, 290 F.3d at 1025. To that end, SLUSA permits removal and dismissal of "covered class actions,"[7] brought under state

---

[7]SLUSA defines the term "covered class action" as:

  (i)    any single lawsuit in which—

      (I)   damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

      (II)  one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or mem-

law, alleging a misrepresentation or omission of material fact in connection with the purchase or sale of a "covered security."[8] 15 U.S.C. §§ 78bb(f)(1) and (2);[9] *Falkowski*, 309 F.3d at 1128.

## II. Propriety of the Initial Removal of the Arizona Action.

As noted, defendants removed the Arizona action to federal court under SLUSA and plaintiffs filed a motion to remand the case back to Arizona state court. In their opening brief, plaintiffs conceded that "if the remand motion were to be determined solely on the basis of the First Amended Com-

---

> bers of the prospective class predominate over any questions affecting only individual persons or members; or
>
> (ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—
>
>> (I) damages are sought on behalf of more than 50 persons; and
>>
>> (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B).

[8]SLUSA defines the term "covered security" as:

> a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred, except that such term shall not include any debt security that is exempt from registration under the Securities Act of 1933 pursuant to rules issued by the Commission under section 4(2) of that Act.

15 U.S.C. § 78bb(f)(5)(E).

[9]This provision amends the Securities Exchange Act of 1934. An identical provision, codified at 15 U.S.C. § 77p, amends the Securities Act of 1933.

plaint's allegations, their motion to remand was properly denied [because it] did not clearly delineate the varying facts and circumstances applicable to each loan." Appellant's Opening Brief at 46. While this concession arguably resolves the question of initial removability, plaintiffs still argue that the district court erred by failing to look beyond the face of the FAC to consider a declaration that plaintiffs presented in support of the motion detailing the specifics of the various loans at issue. This argument fails.

**[2]** SLUSA expressly applies to covered class actions "alleging" fraud in connection with the purchase or sale of a covered security, 15 U.S.C. § 78bb(f)(1), and authorizes removal and dismissal based on the allegations in the complaint and does not require any additional evidentiary showing from either party. *See Williams v. Costco Wholesale Corp.*, 471 F.3d 975, 976 (9th Cir. 2006) ("the propriety of removal is determined solely on the basis of the pleadings filed in state court") (citing *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1213 (9th Cir. 1998)). While the court may permit the *defendant* to support removal by supplementing the pleadings with additional evidence of SLUSA's applicability, *see Lasley v. New Eng. Variable Life Ins. Co.*, 126 F. Supp. 2d 1236, 1239 (N.D. Cal. 1999), no authority requires that a district court must consider additional evidence from the *plaintiffs* on a motion to remand. Moreover, any error that may have occurred due to the district court's failure to take account of the additional evidence in plaintiffs' declaration was cured by its grant of leave to amend. Plaintiffs incorporated the essential factual information in the declaration into their SAC, and the district court considered those facts in its evaluation of that amended complaint.

## III.  SLUSA does not prohibit post-removal amendment of a complaint.

**[3]** Whether SLUSA allows or prohibits amendment of the complaint in a removed action is an issue of first impression

in this circuit. As a general rule, a plaintiff "may not compel remand by amending a complaint to eliminate the federal question upon which removal was based." *Sparta Surgical Corp.*, 159 F.3d at 1213. This principle is applicable to SLUSA, which "stands as an express exception to the well-pleaded complaint rule, and its preemptive force cannot be circumvented by artful drafting." *Rowinski v. Salomon Smith Barney, Inc.*, 398 F.3d 294, 304 (3d Cir. 2005). Following this rationale, other circuits that have considered the issue have not allowed a plaintiff class to amend its way around a SLUSA dismissal, at least where the amended complaint, "fairly read," still contains allegations of fraud or deception involving a covered security. *See Dudek v. Prudential Sec., Inc.*, 295 F.3d 875, 879-80 (8th Cir. 2002) (plaintiffs' omission of certain fraud allegations previously pled in a different case did not save complaint from SLUSA dismissal); *Behlen v. Merrill Lynch*, 311 F.3d 1087, 1095-96 (11th Cir. 2002) (dismissing claims under SLUSA despite attempt to remove federal claims by amendment).

**[4]** However, Congress included no express prohibition against amendment and no court has held that SLUSA completely and categorically bars any amendment of the complaint following removal. Moreover, there is precedent in the district courts of this circuit for the view that a plaintiff *may* avoid SLUSA dismissal through amendment. For example, in *Schuster v. Gardner*, 319 F. Supp. 2d 1159 (S.D. Cal. 2003), the district court permitted plaintiffs to amend their complaint to avoid SLUSA dismissal. The court credited the plaintiffs' argument that any federal claim in the original complaint was inadvertently pled, allowed amendment, and remanded the resulting state-law action to state court. *Id*. at 1164.[10] Simi-

---

[10]Specifically, the court reasoned that while "subject matter jurisdiction is generally determined by looking at the facts as pled in the complaint operative at the time the notice of removal is filed, . . . defendants have the burden of establishing federal jurisdiction, and any doubt as to the right of removal must be construed in favor of remand." *Id*. at 1163 (internal citations omitted).

larly, in *Chinn v. Belfer*, No. 02-00131, 2002 WL 31474189 (D. Or. 2002), the court noted that "[i]nterpreting Ninth Circuit authority, other district courts have granted leave to amend a removed complaint to eliminate federal claims." *Id.* at *7 (collecting cases). The court accordingly allowed plaintiffs the opportunity to amend to eliminate any federal claim and thereby avoid SLUSA dismissal.

[5] We are not, of course, bound by district court decisions, and there are certainly defensible policy justifications for the defendants' position. Allowing amendment of claims to avoid dismissal could allow plaintiffs to "artfully plead" their way around federal jurisdiction and back into state court—by some accounts, precisely what SLUSA was meant to prevent. *See Rowinski*, 398 F.3d at 304. However, district courts that have confronted the issue have also recognized the inequity of dismissing otherwise valid and viable state law claims on the ground that plaintiff pled— perhaps inadvertently—a cause of action that may be construed as federal in nature. In light of the statutory silence on the issue in SLUSA, the existence of competing policy rationales, and the fact that the granting or denial of leave to amend is ordinarily a matter left to the discretion of the district court, we hold that SLUSA does not prohibit amendment of the complaint after removal.

## IV. The district court properly dismissed the Second Amended Complaint for failure to state a claim in conformity with SLUSA.

[6] Having concluded that the Arizona action was properly removed and that the district court properly permitted plaintiffs to amend the FAC, we turn to the propriety of the district court's dismissal of the SAC with prejudice.[11] On appeal,

---

[11]We review denial of leave to amend only for abuse of discretion, and generally find that such discretion is not abused if further amendment would be futile. *See Polich*, 942 F.2d at 1472. The district court here did not abuse its discretion in denying further leave to amend. It had already given plaintiffs one chance to amend, and plaintiffs essentially re-pled the same facts and legal theories. Most significantly, plaintiffs conceded in oral argument before the district court that they could not improve on the SAC beyond mere "tweaking."

plaintiffs concede the first three elements of SLUSA preemption: that (1) the class action here is a "covered" class action, and that it alleges (2) state and common law claims and (3) a misrepresentation or omission of material fact.[12] Plaintiffs do, however, challenge elements four and five, claiming that (4) the misrepresentations or omissions at issue were not "in connection with" the purchase or sale of a security under 15 U.S.C. § 78bb(f)(1)(A), and (5) the action does not involve "covered securities" within the meaning of 15 U.S.C. § 78bb(f)(5)(E). Both arguments fail.

In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 126 S.Ct. 1503 (2006), the Supreme Court dramatically simplified the analysis of whether a particular complaint alleges fraud in connection with the purchase or sale of a covered security within the meaning of SLUSA. In *Dabit*, the plaintiff class members were stock brokers who purchased and held various stocks during a period of approximately one year. The plaintiffs filed suit against Merrill Lynch in federal court under Oklahoma state law, alleging that the investment banking firm violated the "fiduciary duty and covenant of good faith and fair dealing it owed its brokers by disseminating misleading research and thereby manipulating stock prices," and that this misleading research induced them to hold shares they would have sold had they known the truth. *Id.* at 1507. The plaintiff brokers argued that their claim was not subject to SLUSA preemption because it was a pure "holding" claim and did not allege the purchase or sale of any particular security.

---

[12]At oral argument, plaintiffs' counsel attempted to resurrect an objection to the "covered class action" requirement by arguing that the SAC effectively disaggregated claims based on separate loan transactions, thereby bringing it outside SLUSA's numerical scope. In addition to being waived by concession in the briefing, *see Currier v. Potter*, 379 F.3d 716, 723 n.4 (9th Cir. 2004), this argument is wrong on its merits. While plaintiffs' counsel might have avoided SLUSA's reach by bringing each of the individual claims separately in Arizona state court, he did not do so in the first instance and did not attempt in the SAC to disaggregate the claims into separate actions.

**[7]** A unanimous Supreme Court flatly rejected a strict "purchaser/seller" requirement and endorsed an expansive view of SLUSA's preemptive scope. The Court began its analysis by noting that "[t]he magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated." *Id.* at 1509. The Court reasoned that, for purposes of SLUSA preemption, "[t]he identity of the plaintiffs does not determine whether the complaint alleges fraud 'in connection with the purchase or sale' of securities. The misconduct of which respondent complaints here—fraudulent manipulation of stock prices—unquestionably qualifies as fraud 'in connection with the purchase or sale' of securities." *Id.* at 1515. It did not matter that the plaintiffs themselves did not purchase or sell a covered security; rather, "it [was] enough that the fraud alleged 'coincide' with a securities transaction—*whether by the plaintiff or by someone else*." *Id.* at 1513 (emphasis added).[13]

**[8]** Plaintiffs in this case seek to avoid SLUSA dismissal by arguing that they did not purchase or sell any listed security in response to the misrepresentations, and that, therefore, they do not allege fraud in connection with the purchase or sale of a security. This is the very argument that *Dabit* rejected. Plaintiffs allege a scheme to fraudulently hide Saxton's financial condition—having the necessary effect of artificially inflating the price of Saxton's publicly traded shares—through material misrepresentations in Saxton's public filings and other public statements. They allege harm from this scheme through inducement by misleading financial information to refrain from exercising rights under their several loan documents. While plaintiffs themselves did not purchase or

---

[13]The Court also distinguished the limitation it imposed in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), that only actual buyers and sellers of securities have a private right of action under Securities and Exchange Commission Rule 10b-5, explaining that it previously imposed that limitation because the private right of action was a judicially-crafted remedy, and because even weak cases under Rule 10b-5 may have substantial settlement value. *Dabit*, 126 S.Ct. at 1509-15.

sell any of the publicly traded shares of Saxton, *Dabit* does not require that they do so. They have alleged fraud that "coincide[s]" with the purchase or sale of securities, and SLUSA therefore preempts their claim.

**[9]** For similar reasons, the Court's decision in *Dabit* also forecloses plaintiffs' arguments on SLUSA's "covered security" requirement. SLUSA preemption applies only if the misrepresentation affects the purchase or sale of a "covered security," as defined at 15 U.S.C. § 78bb(f)(5)(E). Plaintiffs advance different arguments for the various types of debt instruments described in their SAC. They maintain that each debt instrument is not itself a "covered security," either because it was not issued by a publicly-traded corporation, was not in existence at the time of the alleged misrepresentations, is otherwise outside the scope of the statutory definition, or is eligible for one or more statutory exemptions. However, the Supreme Court's decision in *Dabit* renders all these arguments irrelevant. Whether or not one or more of the relevant debt instruments is a "covered security" does not affect the applicability of SLUSA to this action because the alleged harm stems from misrepresentations in Saxton's public filings and public statements. These misrepresentations undoubtedly "coincide" with the purchase or sale of Saxton's publicly traded shares, and those shares are clearly "covered securities" under SLUSA.

We our mindful of the general "presum[ption] that Congress does not cavalierly pre-empt state-law causes of action." *Dabit*, 126 S.Ct. at 1514 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (alterations in original)). But, as the Court noted in *Dabit*,

> that presumption carries less force here than in other contexts because SLUSA does not actually pre-empt any state cause of action. It simply denies plaintiffs the right to use the class action device to vindicate certain claims. The Act does not deny any individual

plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist.

126 S.Ct. at 1514. The holding in *Dabit* is thus both broad and narrow in its application. The Court's articulation of the "in connection with" requirement is expansive, broad enough to reach present plaintiffs. But it is also very narrow, in that present plaintiffs could have completely avoided SLUSA's reach by pursuing their claims in groups of 50 or less or by bringing a federal claim that meets the strict pleading requirements of the PSLRA.[14] Instead, plaintiffs chose to proceed in Arizona state court under Arizona state law as an aggregated class of hundreds of plaintiff lenders, and it is access to that procedural device that SLUSA denies. Our empathy for possibly defrauded plaintiffs does not permit us to flout the clear instruction of the United States Supreme Court.

## V.  The district court did not err by not remanding viable state law causes of action under 15 U.S.C. § 78bb(f)(3)(D).

[10] SLUSA provides that "[i]n an action that has been removed from a State court pursuant to paragraph (2) [as a "covered class action"], if the Federal court determines that the action may be maintained in State court pursuant to this subsection, the Federal court shall remand such action to such State court." 15 U.S.C. § 78bb(f)(3)(D). Plaintiffs argue that this statutory provision allows the district court to dismiss only preempted claims and requires it to remand any remaining viable state-law causes of action to the state court. It is not

---

[14]We also note that SLUSA contains several express exemptions for certain kinds of state actions, though plaintiffs are not eligible for these. *See, e.g.*, 15 U.S.C. § 78bb(f)(3)(A) (exempting actions based on the law of the defendant's state of incorporation or organization) and 15 U.S.C. § 78bb(f)(5)(C) (exempting pure derivative actions from the definition of "covered class action").

settled whether SLUSA either permits or requires the remand of particular claims in a single suit that contains some claims that are preempted, and some claims that are not. After the Supreme Court's decision in *Dabit*, however, plaintiffs have no claims that avoid SLUSA preemption. Thus, there are no viable state-law claims to remand, and we need not—and do not—reach this issue in this case.

## *CONCLUSION*

**[11]** Under the standards the Supreme Court announced in *Merrill Lynch v. Dabit*, plaintiffs' lawsuit is clearly covered by SLUSA. We therefore hold that plaintiffs' Arizona lawsuit was properly removed to federal court under SLUSA and that the district court properly dismissed the SAC with prejudice.

**AFFIRMED**.